May it please the Court, my name is Josh Siegel. I'm an attorney for the petitioner. I'd like to reserve two minutes for rebuttal, if I may. Your Honors, as you can see from the extensive record in this case, the key question is, the real, the main issue is whether ICE agents, dozens of them, armed with rifles descending on this flower farm out in the countryside in bands, in a 20-year-old woman who was hiding, leading her out to a parking lot in handcuffs, questioning her, questioning her some more at a subsequent facility over a period of an ordeal that lasted five to six hours. The real question is, is this, would a reasonable officer see this entire scenario as something that violated some of her constitutional rights, or specifically in the Fifth Amendment context, is it something that overbore her will to the point where she gave involuntary assistance? So are you focusing, therefore, on the interrogations after they pick her up, after she hid? Well — Are you challenging the detention after she — they found her after she hid, or are you challenging what happened after that? Both, Your Honor. In the Fourth Amendment context, the first — the first question is, was she even seized? Was there a seizure? The government has said there wasn't even a Fourth Amendment event, which means, essentially, she wasn't seized because she was arrested in conjunction with a search warrant, and she was — I didn't understand them to say there wasn't a Fourth Amendment event. I understood them to say, at least in passing — at least one of their points was that once she hid, and they knew there were lots of undocumented aliens in general there, or, you know, people, that they had probable cause at that point to arrest her. Well, I'm looking at the — Once they arrested her, I mean, then maybe you have a Fifth Amendment Miranda problem. I'm not sure what. Well, I — So first of all, do you — what is your — what is your position with regard to the — what they did after they found her? Well, she was seized. Okay. She was seized. Yes. She was seized. And so the — Was there probable cause at that point to arrest her as undocumented? Right. So if — Right what? Yes or no? Yes. There was probable cause at that point. To arrest her? Yes. No, there wasn't. There wasn't even — Why not? So she's hiding in a situation where they're looking for undocumented people. Why isn't there probable cause? Well, first, she wasn't mentioned in the warrant. So she — so they — But no one was, right? Yes. Wasn't it just, in general, we think there are undocumented people here? No. There was several — there was a list of three or four or five people, and they were arrested. But then didn't it also say, and there are others? Yes. Something general like that. It did. It did say that. So they find her hiding. Are you challenging the warrant? I'm sorry? Are you challenging the legitimacy of this kind of a warrant? No, Your Honor, because this Court has ratified Blackie v. House of Beef, and — Has ratified what? The Blackie v. House of — Blackie v. House of Beef, the warrant, the administrative warrant. This wasn't a criminal search warrant. This was sort of an administrative warrant. Well, but what does it mean to have an administrative warrant to search for undocumented individuals? I mean, how do you search for an undocumented individual? You look at them and you say they're undocumented? That's a great question. That's a very good question. It's a — this back — I mean, was this a Delgado kind of a warrant, the ones where they say what they're doing is they're — they're coming in and they're doing a survey, which means they're asking permissive questions and they're letting people walk around? Was that what this was? So this was what they call a Blackie's warrant, which is following from Blackie's House of Beef. It's a case from 1981 where some agents went into this restaurant and arrested a bunch of undocumented immigrants. And there was a — there was a question of do they have to comport with sort of the Rule 41 requirement of probable cause that you find in a criminal search warrant? And which — and they ultimately decided, no, that they don't have to. There has to — and this was out of the District Court of Appeals in the District of Columbia. But what they — what they decided was there is different levels of probable cause, or at least for the particularity requirement for a warrant, it doesn't have to be as particular as a criminal search warrant. And so this isn't as low as sort of an enforcement, an OSHA kind of inspection search warrant, but it's not as high as — and the government's kind of — Okay. But how do you find — once you get there, how do you find out who's an undocumented alien? Well, that's a good — that's the question, and that's where it goes. I assume it's the Delgado — it's the Delgado way, that this is what was being approved in Delgado, but only in a limited way, i.e., you don't detain people within the building. You can stop them from leaving, and you can ask them questions, but you can't force them to answer. Yes. Yes. And no — but that still needs to comport with the Fourth Amendment, which is, you know, the touchstone is reasonableness. So everything — everything has to be carefully tailored to that reasonableness requirement, and this Court has said that numerous times over and again. So when they first saw the Petitioner, she was hiding. They call her out. There's three male officers. They have rifles. And right then, they slap handcuffs on her. Our argument is that right there, that violated her Fourth Amendment. Well, wait a minute. Why isn't there at least enough for a Terry stop at that point? Well, because there's different ways — the question — the first question, if there's a seizure, which there was, the question is, was it reasonable? Was the detention reasonable under the circumstances? What did they know? Well, I mean, there are just an awful lot of cases saying that for Terry stops, it's okay to handcuff people. I mean, I don't — never quite understood that, but there certainly are cases. But there's different ways to detain people. They obviously see she's not armed. There's three armed ICE agents. They see her. They see maybe she's Hispanic-looking. Well, we know from case law that's not enough. Being Hispanic-looking — But why isn't the fact that she's hiding enough? Well, hiding, the act of hiding on its own is not enough. That's — and that was the case I had on the Garcia case, I believe, that it's equivocal. People hide for dozens of reasons. What she said, she was hiding. There's shouting. There's a helicopter flying. But she also said she was hiding because she was afraid — because she knew she was illegal. Well — Didn't she say that? Yes. But so the challenge with — that was vigorously objected to because the trial attorney argued that you're kind of pitting Fourth and Fifth Amendment rights against one another, and a witness should not be put in that position. That was — that was never reached by the immigration judge and subsequently by the board. It was just not an issue that was reached. So in a way — Wait, didn't the — I may be forgetting, but didn't the immigration judge think that there was probable cause because she was hiding? No. The immigration judge found there was a seizure, which was undisturbed by any — the board or any of her subsequent decisions. She found that after her prima facie finding that the Fifth Amendment and regulatory violations existed, she found that, subsequent to her testimony, that there wasn't this egregious-like behavior, this — something a reasonable officer would find violates her rights. In other words, guns weren't pointed at her. They weren't sort of — you know, she wasn't detained for a prolonged period of time. Though — which is odd because this whole ordeal lasted five — at least five hours, maybe six hours, the entire thing, and to the point where she was nauseous at the end and threw up. We don't know if she was ever given food or water throughout this entire incident. It's — the record is completely devoid of that. But did they have a warrant? And with a warrant, somebody hides? Doesn't that create more than just she was hiding? That — yes, Your Honor. But the question is, if they came across, say, a white person, why wouldn't they detain them? When she — she testified, and this is unrebutted, when she went out to the parking lot, there was only Hispanic people there being questioned. But was there any white person who was hiding? Not that I know of, no. Right. Okay. Okay. So we're also arguing that the length of the detention was also unreasonable, that she was let out in handcuffs. So the detention itself has to be carefully tailored to the — to the situation. Here, we're not dealing with a criminal warrant. We're dealing with an administrative warrant for an administrative violation, being in the country illegally. So the question is, did she have to be put in handcuffs and let — she was basically in handcuffs for, as far as we can tell, for upwards of five hours. Did — what of that — at what point did she provide the information that provided the probable cause, if it provided probable cause? I mean, aside from the hiding. When she was let — when she was let out to the parking lot, she — All right. So after that, why does anything have to do with suppression? Meaning, at that point, that's the evidence they introduced or would introduce. Does anything thereafter lead to suppression? Well, in the Fifth Amendment — I mean, it sounds — there may be something else, like a 1983 case or something, but why does it lead to suppression? In the Fifth Amendment context, not in the Fourth Amendment context. When it switches over to an arrest, the case law, as counsel, I believe, noted before in the prior case, it — there's not a — there's not a obligation to provide the rights until she's put in proceedings, which is odd, but — It's very odd. That's the — that's the ruling of this Court. But I guess maybe the — as I understood the question, and I have the question anyway, didn't she provide the information that was going to be the problematic information for her before the hours and hours and bad time at the police office? After about an hour in the parking lot, yes, Your Honor. So why would we look at the time after that? Because any — any arrest or any detention that leads to an arrest can lead to a due process violation. If she was kept for the next two days and questions — But then she'd have a 1983 claim. But what — I mean, the information, it's all harmless or doesn't matter or whatever because all the information was already obtained, right? Like, anything they got after 10 more hours is irrelevant, I think, for suppression purposes, right? Well, so — but the context, the environment — what was happening up until that moment happened at that moment and three hours later. In other words, there were dozens of officers armed there in the parking lot. She was — she was asked questions in English. But ultimately, what you want is to suppress evidence. What do you want to suppress? The statement she made that led to the formation of the 213 in the parking lot. And that was before the — the ensuing many hours. Yes, that's true. So, therefore, if it's not suppressible, isn't that the end of the story for this purpose? I mean, you wouldn't have a 1983 case. Maybe you have a Bivens case. But whatever it is, it isn't this problem. Yes. Yes. Okay. So — so don't we stop at the point that she actually gave the information? Yes. All right. We can stop. And, therefore, what's your argument? Well, the argument is that she — she — her will was overborn under the Fifth Amendment context, or a reasonable officer should have known in the Fourth Amendment context, a reasonable officer should have known that they were violating her rights by — by not carefully tailoring her detention for the purposes of an administrative warrant. Detention up to the point in the parking lot when she said whatever she said? Yes. And what — what was — if you thought there was — and does that all depend on there not being any reasonable suspicion from the hiding or — or probable cause from the hiding? Yes. That and, subsequently, that she's kept in — she's kept in handcuffs. She's asked questions in English or maybe a little bit of Spanish, it says. But she didn't understand what she was being asked. And she signed a paper. And she gave over some documents. There's — the — the atmosphere, we're arguing, overbore her will. Okay. All right. Thank you very much. Your time is up. We'll give you a minute of rebuttal. Thank you. Walter Burkini again for the government, Your Honor. Welcome back. Yes. Yes, Your Honor, I think — Could you explain to me what this warrant is? Is this essentially a Delgado warrant? Yes. Essentially, this is a Delgado-type warrant. Therefore, it only — according to Delgado, it only authorized them to come and essentially stop people from leaving and ask them questions and let them — but they had to let them walk around and ask them questions, which they didn't have to answer. Yes. And, in fact, in this very case, I believe that she, the Petitioner, was walking around until she decided to go hiding. She was walking. She talked to her supervisor or some — or a former — Because I don't know what it means to have an administrative warrant to search for illegal aliens. I mean, you don't have a sign on you that says, I'm an illegal alien. So you can't just go around — when you search for something, you go look for it. But you don't use — it sounds a lot like an arrest warrant, but it's not an arrest warrant because it doesn't talk about any individual people. Well, it does — I believe it does provide the authority to seize as well. I'm sorry? I think the warrant does also authorize the seizure. Well, I know it says it does, but it doesn't tell you any way in which you're supposed to figure out who it is you're seizing. The only way that that could happen is through questioning, Your Honor, I would imagine. Right. Voluntary questioning. Well, not — well, yes. Voluntary questioning. I believe that's the approach. Is that what happened here? Was this voluntary questioning? Yes. Yes. We believe that she was not — by the time — the big difference in this case is that the seizure didn't occur at the outset from the enforcement action. Here, the seizure occurred with ISIS. Obviously, they had the warrant, the search warrant. They knew that there were undocumented workers there, and then they found her hiding, and that raised, at the very least, reasonable suspicion to detain her for questioning under the regulations. So then we have a cherry-strap, is that what we've got? I think at that point, we have — yes. Well, we have a — it's a regulatory — it's an administrative detention. It converted into that, and the 287 regulations allow for that, for detention for questioning when there is reasonable suspicion that the person is undocumented. But if I could just go back — What's — I'm a little confused. How is that not a cherry-stopper? What's the difference? No, it's — I think it's effectively the same. But it's — because the regulations do provide — provide this authority, that's what ISIS relies on, the 287 regulations. And you're not arguing there was even probable cause? I would argue there was probable cause, but that's not what the immigration judge said. The immigration judge said that the seizure — the seizure was reasonable because ICE had — had the search warrant with the knowledge that there were undocumented workers, and in conjunction, they found her hiding, and there was another person hiding. And so that gave — gave enough reasonable suspicion to then detain. So I think at that — You would have to demonstrate that the subsequent time period was a reasonable investigatory stop. Once they got her answer at that point, I suppose at that point they had probable cause. Was that it? Yes, that's correct, Your Honor. They found her hiding. They transported her to the parking lot. And then at that point, they questioned her. So we don't know the exact time frames because we're reliant. I don't think she was able to articulate that in her Barcenas hearing, suppression hearing, but it was a short time after they found her — they found her hiding that they — They said it was — he said it was like an hour. Was that right? I don't think — I would have to review. I don't think that's quite an hour, Your Honor. I think it happened all relatively quickly, if I can — Well, we can find out. That was the representation that was made. I'm sorry. I would like to go back to the actual warrant in the first — in the first place. As I understand it, the — I mean, I was troubled by the warrant, but I don't understand it to be challenged as such. No, the warrant — I don't think that the warrant is being challenged. I think that every circuit that has addressed the issue has found that this warrant is perfectly fine, including this Court in the International Mulder's case, where  And the — and the issue with that warrant, it is a flexible probable cause standard. And sometimes, some warrants, which was the Blackie's House of Beef warrant, it had no named individuals at all. And that was the problem. The district court and — in district court kept — But the warrant, as we said in one of these cases, I think, Nygaard, is a warrant that allows the entry. But after that, after the entry, the question is, how do you search for undocumented workers? I mean, I come back to that. And the answer to that is Delgado, right? Yes. I think that's — So those are the two pieces. You can get in because of this administrative warrant, and then you have to do a Delgado, which means you have to let them walk around. And you say they did do that. Yes. Yes, Your Honor. That's what happened in this case. Except that she hid. Exactly, Your Honor. And she was walking around in this case before she decided to hide. And that then you — any questioning has to be voluntary, but that doesn't apply to her, you would say, because when she hid, they at least had a reasonable suspicion for a mandatory interrogation, essentially. Exactly, Your Honor. Is that — was that the sum of your position? That is exactly our position. So it's essentially just a question of — everything beyond that is irrelevant because she'd been detained to be processing and to remove proceedings, and it was a relatively quick detention all in all. Nobody likes to be detained, but — And as to whatever happened afterwards, what — They would have had probable cause for our arrest. In the actual proceedings here, was there any reliance on anything that happened afterwards? I'm sorry, Your Honor. In the actual proceedings here, was there any reliance on anything that happened afterwards? No, Your Honor. It was just what she said in the parking lot? Yes. Which led to — Once they had that information, that's all they needed. That's the only thing that's being — attempted to be suppressed is her alienage. But did they then interrogate her again after she'd been detained longer? I guess I'm a little confused. It seems like maybe it doesn't matter, but I am a little confused why they continued to detain her and then, I think, questioned her again. They likely did question her again, but just to confirm perhaps the information and to process her into removal proceedings, to serve her with the NTA or, you know, do procedural matters as to, you know, to get her into removal proceedings. But I don't — I think that once she identified her undocumented status in the parking lot, from that point forth, I don't think that it matters, that it's an issue of misconduct. The part that I found disconcerting was that your brief goes back to this whole Summers and Mina argument, which really is — you seem to be trying to marry the two to get — to eliminate Delgado and to say once you're doing this administrative warrant, you can do a — a Summers-Mina detention as soon as you walk in there. But you're not arguing that here. Well, Your Honor, the immigration judge didn't take that position. The board layered — the board adopted the immigration judge's decision on the matter of Borbono, so the immigration judge's decision is also fully under review here.  But that can't be right, because the — this warrant is a different kind of a warrant. It's not a search for anything. It's a search for people. It's still a warrant that requires a finding of probable cause. It's a flexible standard, but at least in this case, it was a — But a search for people is a very strange kind of a warrant. Usually, you call that an arrest warrant if you're actually going to detain people and — and — and automatically. Yeah, but then this — That's usually an arrest warrant. Right. This is not an arrest warrant, Your Honor. This is definitely a search warrant. So how can you take — take this kind of a warrant, which is not for a search — an ordinary search warrant, and — and — and pull it up together with Mina and Summers and — and think that now we — now we don't have Delgado anymore. Delgado's gone out the window. I mean, that seems to be the position that the BIA adopted. And — and I guess that leads to another question. If that's the position they adopted, do we have to say that's wrong and remand it to them for — for your — your present theory? No, Your Honor. I mean, Your Honor, the — again, the immigration judge here, he made the findings of fact and the legal findings that underlie the — the whole agency decision. And the board simply supplemented it on — on appeal, addressing the arguments that were presented to it. But the board adopted and affirmed the immigration judge's — in particular, the September 2011 decisions where the immigration judge made the — the findings that this was a combination of both the — the search — the administrative and the search warrant together with the hiding of the petitioner. And I believe that's at AR-1230. Okay. Anything else? No, Your Honor. I'm done. Thank you so much. Thank you very much. Sir. Thank you, Your Honor. Just a few brief points. The — you mentioned the warrant, and you — you keep asking about the warrant, and rightfully so. This administrative blackies warrant, as they call it, there was a request for the — there's no affidavit in the administrative record at all. So we don't even know what the probable cause was founded on, particularly when the petitioner, in this case, was not even mentioned in the warrant. And I understand there's language in there that says, well, you can — and you can — and evidence of any other illegal alien on the premises. But we don't know what the affidavit says. There was a request for it. There was a request for an administrative subpoena by the judge to get it. But you didn't challenge the warrant. I mean, your brief isn't about how this whole thing started with an invalid warrant. Correct. I'm — I'm just explaining the background to the — to the — to the warrant that she was talking about. And that's at AR-1259 and AR-1260. The other question was the Summers and Minna structure. That was in the criminal context. And as the counsel before me recognized, the law enforcement interest in protecting their safety was highest in cases like that, where you're looking for guns and drugs and evidence of gang representation and everything else. Can I ask the last question that I asked Mr. Bocchini? Did the BIA rely on the reasonable suspicion Terry Stopp theory that's now being propounded, or did they rely on this Michigan v. Summers theory, which essentially, as I understand it, over — disregards Delgado? Which one did they do? Or both? My understanding is — my understanding is both. Through matter of Burbano, they adopted the immigration judge's findings, and — on both grounds. In her initial decision, the immigration judge says, under Summers and Dawson and Minna, I believe that there doesn't even have to be a finding of reasonable suspicion, that under those cases alone, she was lawfully detained and questioned. We disagree. I think there always needs to be a reasonable suspicion, and it needs to be carefully tailored under the Fourth Amendment in this circuit. I don't know if that answered your question, but that was my understanding of what the judge adopted. But in Summers v. Minna, the whole context is these Rule 41 criminal arrest warrants, where you're pretty clear what kind of level of probable cause you need. They go in, people are detained, officer security is at extremely high — is at its highest, I think, as they say in that — in those cases. This is an administrative warrant for an administrative violation. What was the point of arresting a 20-year-old girl when you have three officers with rifles pointed at her and leading her out to this parking lot? You can detain someone by pointing at them and saying, hey, stay right there. I guess the point was to — if they had at least reasonable suspicion at that point because of her hiding, to detain her and ask her questions pursuant to a Terry stop. Okay. And that's our reasonable speculation of it. There's nothing in the record that indicates what an officer was thinking. There was no testimony from — What's the difference what he was thinking? Well, it's because it's that, because we're trying to put ourselves in the position of a reasonable officer who has to carefully tailor a detention to an administrative arrest warrant like this. Right. What's the point in handcuffing her and leading her out and keeping her in handcuffs? Because you're sort of beyond the administrative search at this point. That's the problem. I mean, unless you're resisting that, if you at least have reasonable suspicion at that point, it isn't the administrative search that's running anything anymore. I mean, that's what I understand the theory to be, and I haven't really heard a response to it. And I think that's what the I.J. said at 1230. I mean, the first I.J. opinion says they had reasonable suspicion because she was hiding and she was in this place where they thought there were undocumented people. Yeah, and it was based on her hiding. That was the dispositive fact in addition to the warrant. But didn't the I.J. say, quote, Had the officers pointed their guns at Onofre or threatened to use them, if she did not cooperate, that action may have been totally different. Yes. So the initial judge, I thought, said that the guns were not pointed at her. Yes. Subsequent testimony elaborated on that and established that guns were not pointed at her. She was asked and they weren't pointed at her. Okay. Thank you both very much. Another interesting case. Onofre Rojas v. Sessions is submitted and we will take a short break. Thank you.
judges: Berzon, Friedland, Dominguez